


**FILED**

Jun 10 2024, 1:40 pm

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 23S-PL-180

## Illinois Casualty Company,

*Appellant (Plaintiff below),*

–v–

B&S of Fort Wayne Inc., Showgirl III, Inc., Reba Enterprises LLC, Jessica Burciaga, Jessica Hinton, Jamie Middleton Eason, Lucy Pinder, Abigail Ratchford, Emily Scott, Denisa Trlica, Sara Underwood, Jennifer Walcott Archuletta, Paola Canas, Camila Davalos, Mariana Davalos, Jaime Edmondson, Cielo Jean Gibson, Hillary Hepner, Krystal Hipwell, Melanie Iglesias, Joanna Krupa, Arianny Celeste Lopez, Brooke Marrin, Ursula Mayes, Carrie Minter, Anya Monzikova, Andra Cheri Moreland, Caitlin O'Connor, Lina Posada, Laurie Romeo, Ina Schnitzer, Cora Skinner, Alana Souza, Irina Voronina, Jennifer Zharinova, and Rachel Koren.

*Appellees (Defendants below).*

Argued: October 10, 2023 | Decided: June 10, 2024

Appeal from the Allen Superior Court
No. 02D02-2107-PL-273
The Honorable Craig J. Bobay, Judge
On Petition to Transfer from the Indiana Court of Appeals
22A-PL-432

**Opinion by Justice Massa**
Chief Justice Rush and Justices Slaughter and Molter concur.
Justice Goff concurs in result and dissents in part with separate opinion.

**Massa, Justice.**

Who decides? That is the fundamental question before us today. Of course, the answer depends on who decides what. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (explaining that "'who has the primary power to decide arbitrability' turns upon what the parties agreed about **that** matter"). If we are talking generally about arbitration agreements, courts can determine whether one "exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). But if we are talking more specifically about threshold arbitrability—the power to decide whether a dispute must be first resolved by arbitration—parties may choose to delegate that matter to an arbitrator through agreement. *Id.* at 67–68. To establish an intent to delegate arbitrability, the parties must also satisfy the "clear and unmistakable evidence" requirement, an additional interpretive rule imposed by the United States Supreme Court. *Id.* at 72 (citing *First Options*, 514 U.S. at 944).

Today, Illinois Casualty Company ("ICC") and thirty-three Models contest on the surface whether arbitration is proper based on the assignment of several business insurance policies that ICC issued to B&S of Fort Wayne, Inc., Showgirl III, Inc., and Reba Enterprises, LLC (collectively, "Insured Clubs"). But on a deeper level, this case is about whether the parties agreed to have an arbitrator, rather than the courts, resolve whether their arbitration agreement requires arbitration. Here, two questions exist: First, does the incorporation of American Arbitration Association ("AAA") rules constitute "clear and unmistakable" intent to delegate arbitrability to an arbitrator? Second, did ICC and the Insured Clubs—and the Models by way of assignment—agree to arbitrate arbitrability for the claims asserted by each Model?

We address each issue in sequence. First, we hold, as a matter of first impression in Indiana, that an agreement to arbitrate in accordance with AAA or similar rules reflects "clear and unmistakable" evidence of an intent to delegate arbitrability to an arbitrator. Our rule adopted today tracks most jurisdictions to have answered this question left open by the Supreme Court in *Henry Schein*. But applying our rule to the agreement here yields a nuanced disposition, which leads to our second point. For

2016 and later claims, the trial court must defer to the arbitrator because the agreement incorporates the AAA rules. But because no agreement to arbitrate existed between ICC and the Insured Clubs before 2016, the Models cannot compel arbitration for claims deriving from this period.

We affirm in part and reverse in part.

## Facts and Procedural History

The Models are from around the globe, but their alleged injuries took place from acts taken by strip clubs in Ft. Wayne, where the Models had no prior affiliation or connection. The Models allege the Insured Clubs obtained their pictures and converted them into social media advertisements without the Models' approval between December 2014 and October 2020.

In October 2020, eight of the thirty-three Models filed a complaint against the Insured Clubs in the United States District Court for the Northern District of Indiana. They alleged that the Insured Clubs wrongly used their images and likenesses without authorization or payment, asserting claims (1) under the federal Lanham Act, 15 U.S.C. § 1125, (2) under Indiana's Right of Publicity Law, Ind. Code § 32-36-1, and (3) for unjust enrichment. They later added other Models to the suit.

Of course, the Insured Clubs had insurance policies protecting them from the risk and cost of litigation. So they tendered the suit to ICC for defense and indemnification. Until this point, ICC had issued ten "Businessowners" insurance policies ("Policies") to the Insured Clubs for coverage between 2014 and 2020.[1] Each of the Policies contained similar language guaranteeing that ICC would pay the "sums" if the Insured

---

[1] These included: (1) annual policies to Showgirl with effective dates of November 15, 2014, through November 15, 2016, and August 29, 2017, through August 29, 2018; (2) annual policies to B&S with effective dates of October 16, 2014, through October 16, 2019; and (3) annual policies to Reba Enterprises with effective dates of August 29, 2018, through August 29, 2020.

Clubs became "legally obligated to pay as damages" resulting from "bodily injury," "property damage," or "personal and advertising injury." Appellant's App. Vol. IX, p. 106. ICC agreed to defend them "against any 'suit' seeking those damages." *Id.*

In 2016, ICC added a Cyber Protection Endorsement ("CPE") that limited the personal and advertising injury coverage. The CPE, relevant here, included the following arbitration clause:

> Notwithstanding any provision of this form or the Policy, any irreconcilable dispute between us and an "insured" is to be resolved by arbitration in accordance with the then current rules of the American Arbitration Association, except that the arbitration panel shall consist of one arbitrator selected by the "insured," one arbitrator selected by us, and a third independent arbitrator selected by the first two arbitrators. Judgment upon the award may be entered in any court having jurisdiction. The arbitrator has the power to decide any dispute between us and the "insured" concerning the application or interpretation of this form. However, the arbitrator shall have no power to change or add to the provisions of this form. The "insured" and us will share equally in the cost of arbitration.

Appellant's App. Vol. IV, p. 136. Because the CPE was added in 2016, it only applied to six of the ten Policies.

In response to the suit, ICC twice sent coverage denial letters, disclaiming any defense or obligations related to the Models' suit. After ICC's last round of letters, the Insured Clubs and the Models entered into a Settlement Agreement ("Agreement"), effective May 25, 2021. The Agreement assigned the Insured Clubs' "rights, claims, and causes of action against ICC" to the Models. Appellant's App. Vol. IX, p. 188. The release, payment, assignment, and covenant terms of the Agreement required a consent judgment to be entered before those terms could take effect. The Insured Clubs and the Models jointly moved to approve the

consent judgment, which the district court denied. The parties jointly renewed their motion, which the court later granted.

Before the consent judgment was approved by the federal district court, ICC filed a declaratory judgment action in the Allen Superior Court against the Insured Clubs and the Models. ICC sought a declaration that it had no duty to defend or indemnify the Insured Clubs under any of the Policies. The Insured Clubs and the Models moved to compel arbitration, which ICC opposed. The trial court held a hearing, and ICC voluntarily moved to dismiss the Insured Clubs without prejudice. The trial court granted both motions and compelled arbitration for ICC and the Models.[2]

ICC successfully moved to certify the order for interlocutory appeal and to stay arbitration pending appeal. But the Court of Appeals reversed, finding one issue dispositive: whether this dispute fell within the scope of the arbitration provision between the parties. The panel held that none of the Models' claims fell within the provision, and ICC could not be forced to arbitrate. *Ill. Cas. Co. v. B & S of Ft. Wayne Inc.*, 201 N.E.3d 690 (Ind. Ct. App. 2023). The Models sought rehearing, which was denied. In turn, they sought transfer before our Court, which we granted, 212 N.E.3d 1233 (Ind. 2023), thus vacating the appellate opinion, Ind. Appellate Rule 58(A).

## Standard of Review

Because contract interpretation issues are pure questions of law, we review them de novo. *Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 206 (Ind. 2022). "And we do not defer to a trial court's decision on a

---

[2] The trial court found that (1) Indiana and federal law favored arbitration; (2) ICC ambiguously drafted the arbitration clause; (3) the arbitration clause should be construed against ICC; (4) Insured Clubs properly assigned its claims against ICC to the Models under the post-loss exception to insurance agreement "consent-to-assignment" clauses; (5) inconsistent results would emerge from distinguishing between the Models regarding their ability to arbitrate Insured Clubs' claims against ICC; (6) the declaratory judgment action should be stayed pending arbitration; (7) arbitration should commence; and (8) final judgment regarding ICC's obligation to arbitrate should be entered under Trial Rule 54(B).

motion to compel arbitration but likewise review it anew." *Decker v. Star Fin. Grp., Inc.*, 204 N.E.3d 918, 921 (Ind. 2023).

# Discussion and Decision

To begin, the parties disagree about whether the appellate opinion here clashes with *Henry Schein*. The Models say yes, ICC says no. Both parties point to language from that case, but the Models have the better reading.

## I.　Arbitrability and the AAA Rules

### A. Arbitration Law

The Federal Arbitration Act reflects the elementary principle that "arbitration is a matter of contract," and that contracts must be enforced "according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Indiana has a robust policy favoring such agreements. *MPACT Constr. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 905 (Ind. 2004). But this policy comes with a basic limitation: the parties must have "**agreed** to arbitrate their disputes." *Id.* at 907 (emphasis added); *see also Decker*, 204 N.E.3d at 920 (noting the "qualification" that parties cannot be required to submit to arbitration unless they agreed to do so). Courts, as neutral and detached arbiters, will not enlarge arbitration agreements "beyond" their plain language, nor stretch them by "construction or implication." *Progressive Se. Ins. Co. v. Empire Fire & Marine Ins.*, 88 N.E.3d 188, 194 (Ind. Ct. App. 2017), *trans. not sought*. We must apply the plain meaning of words and avoid engrafting new meaning onto otherwise clear language in arbitration agreements. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008) (explaining the plain meaning canon must be applied when "the language is clear and unambiguous" (quotations omitted)). The goal of our interpretation is to discover and unlock the "intent of the parties at the time the contract was made by examining the language used to express their rights and duties." *Progressive Se. Ins.*, 88 N.E.3d at 194. We are bound by the parties' words, not our own interpretive gloss on them.

A "corollary" principle also exists in arbitration law. *See Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020). The United States Supreme Court has recognized that "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein*, 586 U.S. at 67–68 (cleaned up). Above all, an agreement to delegate arbitrability functions as "an additional, antecedent agreement" about who decides. *See Rent-A-Center*, 561 U.S. at 70. So when parties agree to arbitrate arbitrability, a court may not disturb their ratified agreement, "even if the argument for arbitration appears to be wholly groundless." *Blanton*, 962 F.3d at 844 (cleaned up).

If, for example, the parties contractually agreed to delegate arbitrability disputes to an arbitrator, courts must enforce their agreement—regardless of the merits, even if the claim cries out for frivolousness and appears to be baseless by all reasonable metrics and standards. *Henry Schein*, 586 U.S. at 68. The inverse is just as true: if the parties did not delegate arbitrability in an agreement, then the court has the power to resolve the issue "independently." *First Options*, 514 U.S. at 943. The delegation of arbitrability to an arbitrator presupposes the existence of an agreement between parties. Suppose a party never signed an agreement in dispute and opposed being compelled to participate in arbitration. In that case, the question would necessarily strike at the "existence of [an arbitration agreement]" and a court would be within its wheelhouse to answer whether an agreement even exists. *Blanton*, 962 F.3d at 848; *see also Henry Schein*, 586 U.S. at 69 (noting that, "before referring a dispute to an arbitrator, the court determines whether a[n] . . . agreement exists" (citing 9 U.S.C. § 2)). These foundational contract principles are simple enough.

But how must we decide whether the parties have agreed to arbitrate arbitrability? Typically, state law provides courts with the rules of the road for interpreting arbitration agreements. *See Doe v. Carmel Operator, LLC*, 160 N.E.3d 518, 521 (Ind. 2021) (explaining that "traditional state contract law principles will control the Agreement's scope" (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009))). State law also helps courts determine the validity of these agreements. *Id.* at 525 (explaining this

determination is the same "just like other contracts"). But when the federal question of who decides arbitrability is presented, federal law commands the analysis. To facilitate this evaluation, the Supreme Court has employed an additional interpretative rule to help courts resolve that antecedent question. This rule requires parties to agree by "clear and unmistakable evidence" that an arbitrator will decide arbitrability. *Blanton*, 962 F.3d at 844 (cleaned up). As a practical matter, this rule flips the ordinary policy "presumption in favor of arbitration when it comes to questions of 'arbitrability.'" *Id.* (citing *First Options*, 514 U.S. at 944–45).

## B. Incorporation of Arbitration Rules

And this brings us to the main issue today: whether an agreement that incorporates the federal AAA rules clearly and unmistakably delegates arbitrability to an arbitrator. The Models argue that the arbitration clause, "in accordance with the then current rules of the American Arbitration Association," constitutes "clear and unmistakable evidence of the parties' intent to delegate" arbitrability to an arbitrator. Pet. to Trans. at 2. Thus, in the face of such an agreement, courts must "refrain" from reaching the merits under *Henry Schein* and defer to the arbitrator. *Id.* To be sure, ICC does not engage directly with the clear and unmistakable rule but contends that since no valid arbitration agreement existed at all, the trial court's decision does not conflict with *Henry Schein*. Both arguments involve separate but related inquiries about (a) existence and (b) delegation. The latter presupposes the former. We thus first address the Models' contention that an agreement incorporating the AAA rules satisfies the clear and unmistakable rule for arbitrability. We agree, finding two reasons in support of that view: text and precedent.

### 1. Text of AAA Rules

Start with text. By its terms, AAA Rule 7(a) grants arbitrators the exclusive "power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitration of any claim or counterclaim." R-7(a). A couple textual points merit special attention.

First, just because an agreement "merely refers to the AAA rules or permits the parties to request assistance from the AAA" does not necessarily bind them to the rules. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 708–09 (Tx. 2023). This intuitive point does not require a lengthy exposition. *See, e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 998 F.3d 449, 461–62 (D.C. Cir. 2021) (holding an agreement that mentioned in passing reference that the parties may request the AAA to designate a replacement arbitrator did not clear the "clear and unmistakable" hurdle). Simply referencing the AAA rules is not enough to obey this federal decree. The parties must evince a clear and unmistakable intent to incorporate them.

Second, Rule 7(a) vests that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." R-7(a). This broad grant of power gives arbitrators absolute power to decide arbitrability. True, Rule 7(a) does not include the word "exclusive" to modify this power. But as the Sixth Circuit explained in this area, "in law the expression of one thing often implies the exclusion of other things." *Blanton*, 962 F.3d at 849 (citing *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 232–33 (2011)). We agree: "the power" to resolve arbitrability rests exclusively with the arbitrator once the rules are incorporated by the parties. *Airbnb, Inc. v. Doe*, 336 So. 3d 698, 705 (Fla. 2022) (quotations omitted). Additional language from Rule 7(a) gives us a glimpse into this power. The term "including," which is followed by a list of issues, such as "existence, scope or validity," displays rather than "exhaust[s]" the arbitrator's "jurisdiction," which is broad once placed into motion and agreed to by the parties. *Blanton*, 962 F.3d at 848. At its core, the text of Rule 7(a) shows that, once the parties delegate arbitrability to an arbitrator, the arbitrator has the exclusive power to decide arbitrability without court interference.

### 2. Precedent Incorporating Rules

What the text says, precedent from elsewhere validates. Admittedly, this Court has not addressed the issue about the delegation of arbitrability before us today. Recent arbitration cases have dealt with other issues. *See,*

*e.g.*, *Decker*, 204 N.E.3d at 923 (holding an addendum with an arbitration provision was not a valid amendment to account agreement); *Doe*, 160 N.E.3d at 526 (holding that a non-party was not entitled to arbitration under equitable estoppel). But the Supreme Court has illuminated a path. *Henry Schein* clarified that the AAA rules "provide that arbitrators have the power to resolve arbitrability questions." 586 U.S. at 66. Elsewhere, the Court has relied on parties' incorporation of the AAA rules to decide what the parties agreed to. *See Preston v. Ferrer*, 552 U.S. 346, 362–63 (2008) (explaining that the "incorporation of the AAA rules, and in particular Rule 7(b), weighs against inferring from the choice-of-law clause an understanding shared by [the parties] that their disputes would be heard, in the first instance, by the Labor Commissioner"). Indeed, while the nation's highest court "has yet to put these pieces together" to conclude that an arbitration provision's incorporation of the AAA rules reflects clear and unmistakable evidence of an agreement to arbitrate arbitrability, there is "little doubt about the final picture." *Blanton*, 962 F.3d at 845.

Our decision today is supported by most federal and state courts that have addressed this exact question.[3] Over the last four decades,[4] nearly every federal circuit court—except possibly the Seventh Circuit—has held that an agreement to arbitrate in accordance with the AAA rules, or rules substantively akin to granting the arbitrator the power to decide arbitrability, constitutes clear and unmistakable evidence of an intent to

---

[3] We thank the Supreme Court of Texas in *TotalEnergies*, 667 S.W.3d at 704 n.11, which conducted an extensive survey of these cases.

[4] This first view traces its origins back to 1981, when the First Circuit held that a contract delegated arbitrability issues to the arbitrator by compelling arbitration in accordance with the International Chamber of Commerce arbitration rules, which ensured that "any decision as to the arbitrator's jurisdiction shall be taken by the arbitrator himself." *Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt. & Sys. Co.*, 643 F.2d 863, 869 (1st Cir. 1981). This decision was later reaffirmed by the First Circuit under the "clear and unmistakable" standard in 1989. *See Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989).

arbitrate arbitrability.[5] While the Seventh Circuit has leaned in the other direction,[6] we find firm footing with nearly every other federal circuit to have reached the same conclusion as we do today.

State courts have reached broad consensus, too. For example, as the Supreme Court of Texas in *TotalEnergies*, 667 S.W.3d at 705 n.12, catalogued, ten of the fifteen state supreme courts that have faced this question have reached the same conclusion reached by the near unanimity

---

[5] *See, e.g., Bosse v. N.Y. Life Ins.*, 992 F.3d 20, 29 (1st Cir. 2021) ("This Court is clear that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator."); *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (holding incorporation of JAMS rules "clearly and unmistakably delegated questions of arbitrability to the arbitrator"); *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103–04 (3d Cir. 2020) (holding incorporation of AAA rules reflects clear and unmistakable evidence that the parties agreed to arbitrate arbitrability), *cert. denied*, 141 S. Ct. 1685 (2021); *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.2d 522, 528 (4th Cir. 2017) (holding "that, in the context of a commercial contract between sophisticated parties, the explicit incorporation of JAMS Rules serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability"), *abrogated by Henry Schein*, 586 U.S. 63; *Mendoza v. Fred Haas Motors, Ltd.*, 825 F. App'x 200, 202–03 (5th Cir. 2020) (holding incorporation of AAA rules reflects clear and unmistakable evidence of delegation of arbitrability to the arbitrator); *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 584 (6th Cir. 2021) ("The text of the Agreement, including the AAA rules, shows that the parties intended to send gateway questions of arbitrability exclusively to an arbitrator."); *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) ("We have previously held the incorporation of the AAA Rules into a contract requiring arbitration to be a clear and unmistakable indication the parties intended for the arbitrator to decide threshold questions of arbitrability."); *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1031 (9th Cir. 2022) (holding incorporation of AAA rules evinces clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability); *Goldgroup Res., Inc. v. DynaResource de Mex., S.A. de C.V.*, 994 F.3d 1181, 1191 (10th Cir. 2021) (holding incorporation of AAA rules "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability issues, including the issue of waiver"); *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1298 (11th Cir. 2022) ("By incorporating [the] AAA rule about the arbitrator's 'power to rule on his or her own jurisdiction' into their agreement, [the parties] clearly and unmistakably agreed to arbitrate threshold arbitrability disputes."); *Commc'ns Workers of Am. v. AT&T Inc.*, 6 F.4th 1344, 1347 (D.C. Cir. 2021) (holding a bilateral contract incorporating the AAA rules clearly and unmistakably delegated threshold arbitrability to the arbitrator); *ROHM Semiconductor USA, LLC v. MaxPower Semiconductor, Inc.*, 17 F.4th 1377, 1383–84 (Fed. Cir. 2021) (holding a bilateral contract between sophisticated parties incorporating the CCCP rules clearly and unmistakably delegated arbitrability to the arbitrator).

[6] It has held that an arbitration agreement's incorporation of the NASD Code, which provided that the "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code," did not reflect "a clear and unmistakable expression of the parties' intent to have the arbitrators, and not the court, determine which disputes the parties have agreed to submit to arbitration." *Edward D. Jones & Co. v. Sorrells*, 957 F.2d 509, 514 n.6 (7th Cir. 1992). But the Northern District of Illinois has reached the opposite conclusion. *See, e.g.*, *Ali v. Vehi-Ship, LLC*, No. 17-CV-02688, 2017 WL 5890876, at *3–4 (N.D. Ill. Nov. 27, 2017) ("Rule 7(a) of the AAA rules could not be clearer about the power of the arbitrator to decide gateway arbitrability issues."); *Bayer CropScience, Inc. v. Limagrain Genetics Corp.*, No. 04-C-5829, 2004 WL 2931284, at *4 (N.D. Ill. Dec. 9, 2004) (holding incorporation of the AAA rules clearly and unmistakably delegated arbitrability to the arbitrator); *but see Taylor v. Samsung Elecs. Am., Inc.*, No. 19-C-4526, 2020 WL 1248655, at *4 (N.D. Ill. Mar. 16, 2020) ("[T]he Seventh Circuit has not addressed the point, and this Court does not find [the contrary] decisions persuasive."). At most, the picture is clouded.

of federal courts.[7] The remaining five state supreme courts have held that incorporation of AAA rules might delegate arbitrability based on context.[8]

The picture could not be clearer from a national perspective. These authorities reveal "a strong indication of how parties would have understood incorporation of the AAA rules when these parties" entered this arbitration agreement. *TotalEnergies*, 667 S.W.3d at 711–12; *see also Blanton*, 962 F.3d at 851 (explaining that "at the time [the party] signed his arbitration agreement, he not only had the benefit of the text of the agreement but also judicial precedent . . . telling him . . . incorporation of arbitral rules can provide clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" (quotations omitted)).

---

[7] Texas became the eleventh state supreme court in this camp. For others, *see, e.g., Uber Techs., Inc. v. Royz*, 517 P.3d 905, 910 (Nev. 2022) ("[A]s many courts have found, incorporating the AAA's rules, even without more, constitutes clear and unmistakable evidence of intent to submit the question of arbitrability to the arbitrator."); *Airbnb, Inc.*, 336 So. 3d 704 (holding incorporation of AAA clearly and unmistakably evinces parties' intent to empower an arbitrator to resolve arbitrability); *Wiggins v. Warren Averett, LLC*, 307 So. 3d 519, 523 (Ala. 2020) ("When an arbitration provision indicates that the AAA rules will apply to the arbitration proceedings, we have held that it is 'clear and unmistakable' that substantive-arbitrability decisions are to be made by the arbitrator . . . ."); *Ally Align Health, Inc. v. Signature Advantage, LLC*, 574 S.W.3d 753, 758 (Ky. 2019) (holding incorporation of the AAA rules delegates arbitrability to the arbitrator even if an agreement carves out claims for equitable relief); *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 45 (Mo. 2017) (holding incorporation of AAA rules delegates arbitrability to the arbitrator), *abrogated on other grounds by Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432, 439 (Mo. 2020); *Garthon Bus. Inc. v. Stein*, 86 N.E.3d 514, 514 (N.Y. 2017) (holding incorporation of the London Court of International Arbitration rules clearly and unmistakably delegated arbitrability to the arbitrator); *W. Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 796 S.E.2d 574, 588 (W. Va. 2017) (applying Arizona law and holding "that incorporation of the AAA rules into the arbitration agreements is sufficient evidence that the parties clearly and unmistakably agreed to arbitrate arbitrability"); *26th St. Hosp., LLP v. Real Builders, Inc.*, 879 N.W.2d 437, 446 (N.D. 2016) ("The incorporation of the AAA Rules is clear and unmistakable evidence the parties agreed to arbitrate the question of arbitrability."); *HPD, LLC v. TETRA Techs., Inc.*, 424 S.W.3d 304, 308, 310–11 (Ark. 2012) (holding clause incorporating AAA rules that required arbitration "to the exclusion of any court of law" clearly and unmistakably delegated arbitrability, even though severability clause and default provision allowed "resort[ing] to all remedies at law or in equity"); *Smith Barney, Inc. v. Keeney*, 570 N.W.2d 75, 78 (Iowa 1997) (holding incorporation of the NASD Code "clearly and unambiguously commits the interpretation and application of all of its provisions to the arbitrator").

Today, we, too, embrace the text of the AAA rules and precedent supporting that understanding and adopt the following general rule in Indiana: an agreement to arbitrate in accordance with the AAA or similar rules represents "clear and unmistakable" evidence that the arbitrator "shall have the power" to exclusively decide "the arbitrability of any claim."[9] Thus, if the parties entered into an arbitration agreement that incorporated these rules, arbitrability must be decided by an arbitrator.

## II.   Applicable Arbitration Agreement

The larger picture has been painted: an arbitration agreement that incorporates AAA rules is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. Simple enough. But what about the arbitration agreement between ICC and the Insured Clubs, and, in turn, the Models through assignment? We must now ensure the arbitration agreement satisfies our rule and see if it applies to each Model.

But before answering those questions, we acknowledge a key concession from ICC: an arbitration agreement existed with itself and the

---

[8] *See, e.g.*, *Hoyle, Tanner & Assocs., Inc. v. 150 Realty, LLC*, 215 A.3d 491, 498 (N.H. 2019) (holding incorporation of AAA rules did not clearly and unmistakably delegate arbitrability to the arbitrator when the agreement granted both parties an option to file suit); *Nethery v. CapitalSouth Partners Fund II, L.P.*, 257 So. 3d 270, 274–75 (Miss. 2018) (applying Delaware law and holding incorporation of the AAA rules did not delegate arbitrability because the agreement carved out claims for injunctive relief and specific performance); *Glob. Clients Sols., LLC v. Ossello*, 367 P.3d 361, 369 (Mont. 2016) (holding an agreement to resolve disputes through arbitration administered by the AAA and under "its rules and procedures" did not clearly and unmistakably delegate arbitrability when it involved an unsophisticated consumer and a debt-relief organization, and where neither party stated "which of the multiple sets of commercial or consumer AAA rules are supposedly incorporated here"); *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80–81 (Del. 2006) (adopting "[a]s a matter of policy" the "majority federal view," but only when the clause broadly requires arbitration to all disputes between the parties); *Flandreau Pub. Sch. Dist. # 50-3 v. G.A. Johnson Constr., Inc.*, 701 N.W.2d 430, 437 n.6 (S.D. 2005) (rejecting "a per se finding of intent to arbitrate arbitrability based solely upon the incorporation of AAA Rule 8 in the agreement").

[9] Because this case concerns the general rule, we decline to recognize possible exceptions, which other jurisdictions have debated concerning (1) unsophisticated parties, (2) class actions, and (3) carve-out claims within arbitration agreements. *TotalEnergies*, 667 S.W.3d at 706–07 (listing cases).

Insured Clubs. ICC instead challenges the scope of the arbitration agreement and the validity of the assignment from the Insured Clubs to the Models. In turn, the Models argue that arbitrators have "exclusive jurisdiction" to decide arbitrability. Appellees' Br. at 37. Each argument is related but requires an independent assessment. Here, there are three broad issues at play: (1) the merits of the underlying controversy, (2) whether the merits must be resolved through arbitration or through a court, and (3) who decides arbitrability. But each question must be properly separated in our analysis. *See Henry Schein*, 586 U.S. at 71 (explaining that courts must sort between "the question of who decides arbitrability" and the "separate question of who prevails on arbitrability"). And because each question must be answered in reverse order, we start with the third question and conclude that an arbitrator must decide arbitrability based on the terms of this agreement. Since the dispositive question is who decides arbitrability, we do not express a view on (1) the underlying merits and (2) whether an arbitrator must resolve this dispute.

## A. Models with 2016 and Later Claims

Applying our new rule, we first conclude the Models with 2016 and later claims fit within our rule and thus are entitled to arbitrate arbitrability with ICC.

To begin, the Insured Clubs' assignment to these Models was valid. While federal law governs the substance of an arbitration agreement, state law controls "'who is bound'" to one. *Doe*, 160 N.E.3d at 521 (quoting *Arthur*, 556 U.S. at 630). Typically, "only contracting parties, or those in privity with them, have rights under an arbitration agreement." *Id.* at 522.

Here, when the Insured Clubs settled the Models' claims, they assigned to the Models "all of their rights, claims, and causes of action against ICC," as well as "any applicable insurance policy or policies." Appellant's App. Vol. IX, p. 188. In other words, the Models were given the chance to step into the shoes of the Insured Clubs as assignees of the claims under the Policies with ICC. This assignment took effect after entry of stipulated consent judgments against the Clubs. Thus, these Models are in privity with ICC as assignees of the Policies. *See Gelbach v. Hawkins*, 654 N.E.2d 877, 880 (Ind. Ct. App. 1995) (assignees "are in privity of contract with the

[assignor's contractual counter-party] and are bound by the agreements"); *Trinkle v. Leeney*, 650 N.E.2d 749, 753 (Ind. Ct. App. 1995) (assignee of promissory note "stands in the shoes of the assignor").

There is a dispute about whether the Insured Clubs' assignment of their post-loss claims against ICC to the Models was also valid under state law. Here, the consent-to-assignment clause in the Policies required ICC's consent, which was never obtained. While consent-to-assignment clauses are generally enforced as "boilerplate" clauses in insurance contracts, courts also "widely recognize an exception to the enforcement of consent-to-assignment clauses for assignments made after a loss has occurred." *Travelers Cas. & Sur. Co. v. United States Filter Corp.*, 895 N.E.2d 1172, 1178–79 (Ind. 2008); *see also New v. German Ins.,* 21 N.E. 475, 476 (1892) ("[A]fter a loss has occurred the policy becomes a chose in action and is assignable as other choses in action are."). We have embraced this exception with open arms because "once a loss occurs, an assignment of the policyholder's rights regarding that loss in no way materially increases the risk to the insurer." 895 N.E.2d at 1179 (quoting Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 49:126 (4th ed. 2000)). And so once a loss occurs, "the indemnity policy is no longer an executory contract of insurance," but instead "a vested claim against the insurer and can be freely assigned." *Id.* Thus, given our widely recognized post-loss exception, the Insured Clubs were entitled to assign their claims against ICC to the Models, notwithstanding the consent-to-assignment clause here.

We turn next to the substance of the arbitration agreement to see if it satisfies our new rule. The agreement here is clear and unambiguous: ICC agreed to arbitration "in accordance with the then current rules of American Arbitration Association." Appellant's App. Vol. IX, p. 165. Those rules include Rule 7(a), which grants the arbitrator "power to rule on his or her own jurisdiction," which includes determining the "existence, scope, or validity" of the agreement. R-7(a). By its plain terms, this agreement reveals the parties incorporated the AAA rules, which in turn constitutes clear and unmistakable evidence they agreed to arbitrate arbitrability. And while these "agreements may be less fun than a night out with friends," the "same rules of English apply." *Blanton*, 962 F.3d at

849. Thus, because the parties embraced the AAA rules by including this key incorporating language in their arbitration agreement, *see id.* at 851; *TotalEnergies*, 667 S.W.3d at 712, the arbitrator must decide arbitrability for these Models.

We thus affirm the trial court's order compelling arbitration for them.

## B. Models with Pre-2016 Claims

The Models with pre-2016 claims, however, are not entitled to compel arbitration for a single reason: ICC and the Insured Clubs never agreed to arbitration for pre-2016 claims. The Models, therefore, cannot compel arbitration for these claims even if the assignment to them was valid.

Here, ICC correctly points out that, even if the Insured Clubs' assignment to the Models was proper, nearly a third of them do not allege a publication of their images after the 2016 addition of the CPE, which included the arbitration provision. What ICC suggests, the Models' amended complaint confirms. The first effective date for any ICC policy issued to the Insured Clubs that contained the CPE form's arbitration clause was on October 16, 2016, August 29, 2017, and August 29, 2018, respectively.[10] Thus, because the Insured Clubs would not have a right to arbitrate before these dates, the Models asserting any claims before 2016 could likewise not have been assigned any right to do the same. *See Brown v. Ind. Nat'l Bank*, 476 N.E.2d 888, 894 (Ind. Ct. App. 1985) (explaining that an assignee takes no greater rights than those possessed by assignor), *reh'g and trans. denied*. These Models therefore have no legal "basis to compel arbitration" because the Insured Clubs never agreed to arbitration with ICC. Appellant's Br. at 28. Because our rule presupposes the existence of an agreement, we must defer to an arbitrator only when the parties agreed to incorporate the AAA rules, which is clear and unmistakable evidence.

---

[10] The ICC's policies containing the CPE form within the arbitration agreement included the following: (1) Policy No. BP30280, first date with CPE form (10/16/2016) with B&S of Fort Wayne Inc.; (2) Policy No. BP40588, initial effective date (8/29/2017) with Showgirl III, Inc.; and (3) Policy No. BP42338, initial effective date (8/29/2018) with Reba Enterprises, LLC.

*See Decker*, 204 N.E.3d at 920 (noting we will not force a party "to submit to arbitration unless it has agreed to do so").

The trial court erred when it did not distinguish between the Models because the relevant question is whether an arbitration agreement existed with each Model, not the Models as a whole. We acknowledge that, as a matter of policy, our conclusion today about these Models may sanction an inefficient and costly piecemeal litigation campaign. But the Federal Arbitration Act "requires enforcement of arbitration agreements, even if the result is piecemeal litigation and 'notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.'" *Welty Bldg. Co. v. Indy Fedreau Co.*, 985 N.E.2d 792, 803 (Ind. Ct. App. 2013) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983)). Here, the trial court focused too heavily on "the principle of equal justice," Appellant's App. Vol. II, p. 46, and not enough on the principle that "a party cannot be required to submit to arbitration unless he or she has agreed to do so," *Progressive Se. Ins.*, 88 N.E.3d at 194. We take no position on this policy outcome. We are simply applying traditional contract principles to protect the parties' bargained-for exchange as umpires of the agreement. Because ICC and the Insured Clubs never "agreed to arbitrate their disputes" before 2016, the Models cannot compel arbitration for claims during this period. *See MPACT Constr. Grp.*, 802 N.E.2d at 907.

We thus reverse the trial court's order compelling arbitration for them.

## Conclusion

We affirm in part and reverse in part.

Rush, C.J., and Slaughter and Molter, JJ., concur.
Goff, J., concurs in result and dissents in part with separate opinion.

ATTORNEY FOR APPELLANT
Thomas J. Costello III
Best, Vanderlaan & Harrington
Chicago, Illinois

ATTORNEYS FOR APPELLEES
Edmund S. Aronowitz
Aronowitz Law Firm PLLC
Royal Oak, Michigan

Brad A. Catlin
Williams & Piatt, LLC
Indianapolis, Indiana

**Goff, J., concurring in the result in part and dissenting in part.**

Nobody can be compelled to arbitrate a dispute without their agreement. Courts must, therefore, determine whether a valid arbitration agreement covers both the parties and the dispute for which arbitration is sought. When a valid arbitration agreement clearly and unmistakably delegates the arbitrability issue to an arbitrator, however, courts must compel the parties to arbitrate the question of whether their agreement covers the dispute.

Here, the Court determines that Models with claims arising in 2016 and after (the 2016 Models)—but not Models with claims arising before 2016 (the pre-2016 Models)—may compel Illinois Casualty Company (ICC) to arbitrate the arbitrability of their dispute. In my view, the Court makes two missteps in reaching these conclusions.

First, the Court holds that the arbitration agreements' references to the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association (AAA Rules or just Rules) clearly and unmistakably demonstrate the parties' intent to delegate arbitrability. I disagree that reference to the Rules necessarily suffices to show such intent, although I find that other language in the agreements independently, and much more clearly, delegates arbitrability.

Second, the Court decides for itself that the pre-2016 Models' claims are outside the scope of their arbitration agreements. But that question isn't ours to answer because it's delegated to the arbitrator.

Ultimately, I would hold that each Model is entitled to compel arbitration on the question of whether her claim falls within the scope of an arbitration clause.

## I. A reference to the AAA Rules is not necessarily sufficient to delegate arbitrability.

The first question is whether the arbitration agreements clearly and unmistakably delegate the arbitrability of the Models' claims to an arbitrator. The evidence of such delegation must be "clear and

unmistakable" because parties "often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 945 (1995) (cleaned up). As "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," courts "hesitate to interpret silence or ambiguity" in favor of delegation. *Id.* at 945.

The arbitration agreements here provide for arbitration of "any irreconcilable dispute between [ICC] and an 'insured' … in accordance with the then current rules of the American Arbitration Association," subject to certain stated variations. App. Vol. IX, p. 165. Rule R-7(a) of the 2013 AAA Rules states that the "arbitrator shall have the power to rule on his or her own jurisdiction," including "the arbitrability of any claim." Am. Arb. Ass'n, Commercial Arbitration Rules and Mediation Procedures 13 (2013). These two facts, the Court holds, suffice to show a clear and unmistakable delegation of arbitrability. *Ante*, at 9–10, 15.

I disagree.

The 2013 version of the AAA Rules was in force when these agreements were made. Rule R-1(a) recognized then, as it does in the current 2022 version, that the Rules might change. *Compare* 2013 AAA Rules at 10 *with* Am. Arb. Ass'n, Commercial Arbitration Rules and Mediation Procedures 10 (2022) (the 2022 AAA Rules). It is difficult to credit contracting parties with the clear and unmistakable intent to conform to rules not yet known. *See* Imre S. Szalai, *Fixing a Power Struggle in America's Civil Justice System*, 27 Harv. Negot'n L. Rev. 209, 246–47 (2022).

What's more, the Rules **have** changed. The 2013 version of Rule R-7(a) did not contain the words which now appear at the end of that Rule: "without any need to refer such matters first to a court." *Compare* 2013 AAA Rules at 13 *with* 2022 AAA Rules at 14. These words were presumably added to clarify what was unclear: whether an arbitrator had power to determine their own jurisdiction absent a prior judicial decision on the matter.

It's also unclear whether the 2013 Rule R-7(a) contemplated exclusive arbitral jurisdiction to determine arbitrability, as opposed to concurrent

jurisdiction with the courts. *See Taylor v. Samsung Electronics Am., Inc.*, No. 19 C 4526, 2020 WL 1248655 at *4 (N.D. Ill., Mar. 16, 2020) (finding no agreement to give the arbitrator "sole authority"); Szalai, *supra*, at 245 (stating that "arguably this provision is not intended to displace the concurrent power of a court to rule on arbitrability"); George A. Bermann, *Arbitrability Trouble*, 23 Am. Rev. Int'l Arb. 367, 376 (2012) (noting that arbitral rules conferring power to determine jurisdiction do "not necessitate depriving courts" of the same power). Indeed, once a federal court and scholarly commentators interpret Rule R-7(a) as **not** (or likely not) conferring exclusive jurisdiction, I find it hard to declare that it "unmistakably" means the very opposite.

Lastly, it's notable that Rule R-7(a) purports to give the arbitrator power to determine the "existence" of an arbitration agreement, although this power belongs in the first instance to the courts. This provision undercuts a reading of Rule R-7(a) as a grant of exclusive powers.

In sum, the arbitration agreements here referenced an ambiguous jurisdictional rule that the AAA subsequently decided to clarify. I am conscious of taking a minority position contrary to the great weight of citations marshalled by the Court. *See ante*, at 12 n.5, 14 n.7. Yet, I cannot conclude that the parties clearly and unmistakably delegated arbitrability to an arbitrator simply by referencing the AAA Rules. I note, however, that the Court leaves open the possibility of cabining its "general rule" by recognizing "exceptions," including limiting the rule's scope to sophisticated parties. *See id.* at 15 n.9.

Although I don't find the reference to the AAA Rules sufficient here, I believe other language in the arbitration agreements **did** make a clear and unmistakable delegation of arbitrability. The text of those agreements provides not only that "**any** irreconcilable dispute" is to be "resolved by arbitration," but also that the arbitrator specifically has "the power to decide any dispute between [ICC] and the 'insured' concerning the **application** or interpretation of this form." App. Vol. IX, p. 165 (emphases added). Unlike the reference to the AAA Rules, the quoted language—taken as a whole—plainly delegates to the arbitrator alone the issue of whether and how the arbitration agreement applies to any given issue. *See*

*Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1267 (11th Cir. 2017) (holding that a term submitting to exclusive arbitration a dispute concerning an agreement's "applicability" delegated arbitrability); *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (reaching the same conclusion for a term submitting to exclusive arbitration the "application" of an agreement).

## II. This Court shouldn't decide the arbitrability of the Pre-2016 Models' claims.

The U.S. Supreme Court has held that a court has no power to set aside a valid delegation of arbitrability, "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 529 (2019).

Here, when the Clubs settled the Models' claims, they assigned to **all** of the Models "all of their rights, claims, and causes of action against ICC," as well as "any applicable insurance policy or policies." App. Vol. X, pp. 71, 76.[1] Because some of the Clubs' insurance policies included arbitration agreements, **all** the Models are now parties to such agreements. *See Asset Allocation & Mgmt. Co. v. W. Emp'rs Ins. Co.*, 892 F.2d 566, 574 (7th Cir. 1989) (explaining that assignment of a contract substitutes the assignee "in the arbitration clause as in the contract's other clauses"); 1 Domke on Comm. Arb. § 13:38 (2023) (stating that the "assignee, as a successor in interest to the contract, generally is entitled to the benefit of the arbitration clause in the agreement"). And, as explained above, those arbitration agreements delegate to the arbitrator the question of whether they apply to any given issue.

Nevertheless, the Court holds that ICC "never agreed to arbitration for pre-2016 claims." *Ante*, at 18. Under *Henry Schein*, we can't make that

---

[1] The words "any **applicable** insurance policy or policies" do not limit which insurance claims were assigned, in light of the preceding words transferring "**all** of [the Clubs'] rights, claims, and causes of action against ICC." *See* App. Vol. X, p. 76 (emphases added).

decision. The arbitrability of the pre-2016 claims is a matter for the arbitrator alone, regardless of our view. For that reason, we are bound to affirm the trial court's order compelling arbitration of all the Models' claims.

## III.    Conclusion

Courts ruling on motions to compel arbitration must ensure that parties are not forced to arbitrate disputes without their agreement. First, there must exist an arbitration agreement binding the party. Second, only when the parties clearly and unmistakably delegated the arbitrability of their dispute to an arbitrator must the arbitrator decide that question. Mere reference to the AAA Rules won't necessarily suffice to make that showing, but more express or precise language may do so.

Applying these principles here, I would hold that all the Models are parties to arbitration agreements that clearly and unmistakably delegate arbitrability. For this reason, I respectfully concur in result in part and dissent in part.